J. MICHAEL LIGHTNER, Regional
Director of Region 22 of the National
Labor Relations Board for and on behalf
of the National Labor Relations Board,

    Petitioner,

v.

LOCAL 560, INTERNATIONAL
BROTHERHOOD OF TEAMSTERS,

    Respondent.

Civ. No. 2:13-2451 (KM)

OPINION

## KEVIN MCNULTY, U.S.D.J.:

    This action arises out of a labor dispute between Local 560, International Brotherhood of Teamsters ("Local 560") and County Concrete Corporation ("County"). County, which delivers ready-mix concrete to construction sites, pays less in wages and benefits than the prevailing area standard as established by local union collective bargaining agreements. Beginning around April 2010, Local 560 began a campaign that included oral and written communications informing contractors of its dispute with County. This action focuses on the Winter 2013 Update Letter that Local 560 sent to various contractors in New Jersey. County believed that certain statements in the Letter constituted threats to enforce an illegal contractual provision and to conduct a secondary boycott, in violation of the National Labor Relations Act ("NLRA"). County therefore filed a charge with the National Labor Relations Board ("NLRB"). When a NLRB officer reasonably believes that a charge is true (*i.e.*, that the NLRA is being violated), Section 10(l) of the NLRA requires the officer to seek a preliminary injunction, and that is what NLRB has done here. Local 560 responds that no statements in the Winter 2013 Update Letter create a reasonable belief that the NLRA is being violated.

    I find that the NLRB does have reasonable cause to believe that the Winter 2013 Update Letter violates the NLRA. Accordingly, I grant the NLRB's

1

Petition for a Preliminary Injunction restraining Local 560 from further violations while the NLRB matter is pending.

## I. BACKGROUND[1]

### A. The NLRA

The NLRB alleges that Local 560 has engaged and is engaging in unfair labor practices within the meaning of Sections 8(b)(4)(ii)(A), 8(b)(4)(ii)(B), and 8(e) of the NLRA.

Section 8(b)(4)(ii)(A)[2] proscribes threatening, restraining, or coercing an employer with an object of forcing or requiring it to enter into an agreement prohibited by Section 8(e). 29 U.S.C. § 158(b)(4)(ii)(A).

Section 8(b)(4)(ii)(B)[3] outlaws secondary boycotts, *i.e.*, threatening, restraining, or coercing an employer with an object of forcing an employer to cease doing business with another employer. 29 U.S.C. § 158(b)(4)(ii)(B).

---

[1] The background facts are taken from the parties' briefs and exhibits. Although neither party sought an evidentiary hearing, I note that these allegations have not yet been tested by any fact finder. That said, there does not appear to be much in dispute regarding the facts in Sections I.B-E.

[2] The text of the section states:

> It shall be an unfair labor practice for a labor organization . . . to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is-- (A) forcing or requiring any employer . . . to enter into any agreement which is prohibited by subsection (e) of this section . . . .

29 U.S.C. § 158(b)(4)(ii)(A).

[3] Section 8(b)(4)(ii)(B) states:

> It shall be an unfair labor practice for a labor organization . . . to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is . . . (B) forcing or requiring any person . . . to cease doing business with any other person . . . : *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . . .

29 U.S.C. § 158(b)(4)(ii)(B).

Section 8(e)[4] makes it an unfair labor practice for a labor organization and an employer to enter into any contract or agreement, express or implied, whereby the employer agrees to cease doing business with another person. 29 U.S.C. § 158(e); *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 635 (1967). This proscription is limited to agreements with a secondary purpose, *i.e.*, agreements directed at a neutral employer or entered into for their effect on an employer not a party to the agreement.

This action is brought under Section 10(l)[5] of the NLRA. That section provides that, if the NLRB officer reasonably believes that a charge alleging violations of Sections 8(b)(4)(ii)(A), (B) or 8(e) is true and that a complaint should issue, the officer shall petition a district court for appropriate injunctive

---

[4] Section 8(e) provides:

> It shall be an unfair labor practice for any labor organization and any employer . . . to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible [sic] and void: *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work . . . .

29 U.S.C. § 158(e).

[5] Section 10(l) states:

> Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of [Sections 8(b)(4)(ii)(A), (B), or (C), 8(e), or 8(b)(7) of the NLRA], the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law . . . .

29 U.S.C. § 160(l).

relief pending the final adjudication of the Board with respect to such matter. 29 U.S.C. § 160(l). "Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law." *Id.* A Section 10(l) injunction is interlocutory in nature and only remains in force pending the final adjudication of the NLRB. *Id.*

### B. History of the Local 560-County Dispute

Since 1978, County has supplied ready-mix concrete and related construction materials, such as sand and gravel, to contractors working on projects in Northern New Jersey. As of April 2011, County employed approximately 50-60 drivers, who are represented by Teamsters Local 863. Since at least January 2009, however, Teamsters Local 863 and County have not been able to arrive at a collective bargaining agreement.

The dispute between County and Local 560 began around April 2010. It includes six charges that County filed with the NLRB. The first charge, No. 22-CC-1522, was filed on November 12, 2010. That charge alleged that Local 560 made repeated threats to picket any wall-to-wall union project for which County was the ready-mix supplier. The NLRB agreed that this would violate Section 8(b)(4)(ii)(B) and advised Local 560 that it would file a complaint. It did not do so, however, because in April 2011, the parties entered into an Informal Settlement Agreement.

On November 3, 2011, County filed a second charge, No. 22-CC-68160. This charge was based on County's being removed from the St. Peter's College project after Local 560 allegedly threatened to picket Sharp Concrete Company ("Sharp") if Sharp purchased concrete from County.

Two months later, on January 4, 2012, County filed the third charge, No. 22-CC-71865, relating to a project to build three office buildings and a parking garage for Novartis in East Hanover, New Jersey. Local 560 had allegedly threatened to picket Macedos Construction, LLC ("Macedos") on that project if Macedos did not terminate its relationship with County. Macedos declined to do so, and Local 560 picketed Macedos.

The NLRB found merit in County's second and third charges. It revoked the Informal Settlement Agreement that had settled the first charge because Local 560 had not stopped threatening neutral employers. On April 26, 2012, the NLRB filed a consolidated complaint encompassing all three of these

4

charges. After holding a one-day administrative hearing and reviewing post-hearing briefs, Administrative Law Judge Lauren Esposito ruled in favor of the NLRB, finding that Local 560 had violated Section 8(b)(4)(ii)(B).

**C. The Teachers Village Project**

Phelps Construction Group is the general contractor on Buildings 2 and 5 of the Teachers Village construction project in Newark, New Jersey. It entered into a project labor agreement (a "PLA") with the Essex County Building and Construction Trades Council (the "Council"), which governs the wages and working conditions for trades working on the project. The PLA requires all contractors and subcontractors that perform Construction Work on the project to sign or otherwise accept the terms of the PLA. The PLA's definition of Construction Work includes all on-site construction work, including local deliveries of concrete. The PLA also incorporates the collective bargaining agreements ("CBAs") of all member unions of the Council, including Local 560. Local 560's CBA, however, does not cover ready-mix concrete deliveries. The PLA addresses this situation by making the PLA controlling in any instance where the PLA and a CBA conflict.

Phelps subcontracted with Macedos to do the construction work on Building 2. Macedos, in turn, contracted with County to deliver concrete for the foundation and slab portions of Building 2.

Beginning on March 26, 2012, Local 560 raised its concern that County did not pay area standard wages and benefits. Local 560's president told Phelps's president that if County supplied concrete to the project without signing the PLA, it would file a grievance against Phelps. A few weeks later, on April 17, 2012, Local 560 sent a letter to County, with copies to Phelps and Macedos. That letter stated that Macedos and Phelps would be liable for damages under the PLA if County did not sign or assent to the PLA.

At the time, the foundation was 95% complete. Because work was nearly finished, Local 560 agreed to allow County to finish pouring the foundation. Before beginning the slab pour, however, Macedos and County would attempt to work out the problem. County refused to sign the PLA, asserting that it was unlawful for the PLA to cover deliveries of ready-mix concrete. Macedos then contracted with another company to deliver concrete.

On June 25, 2012, County filed a fourth and fifth charge with the NLRB: No. 22-CC-83895, which alleges violations of Section 8(e), and No. 22-CE-84893, which alleges violations of Sections 8(b)(4)(ii)(A) and (B).

The NLRB conducted an expedited investigation of these charges and found that each had merit. On August 1, 2012, before the NLRB issued a complaint, Local 560 entered into an Informal Settlement Agreement (the "August 1 Settlement Agreement"), which required it to cease and desist from (1) giving effect to the PLA's provision preventing any subcontractors delivering ready-mix concrete who were not paying area standard wages from working on the jobsite, and (2) threatening Phelps and Macedos in order to force them to cease doing business with County. On January 3, 2013, after Local 560 had publicly retracted the ready-mix signatory subcontracting language, the NLRB closed the case.

### D. The Winter 2013 Update Letter

In late February or March 2013, Local 560 mailed a letter, entitled the "Winter 2013 Update," to a number of contractors,[6] informing them that Local 560 was in an area standards dispute with County. The letter stated:

> Local 560 wishes to remind all AGC Contractors who are signatory to Local 560 construction contracts that the contract does place certain expectations upon the contractor in regard to area standards. . . . Local 560's enforcement of the provision will be enforced through the grievance and arbitration procedure, though this does not necessarily mean that Local 560 will not be engaging in area standards picketing in the presence of County . . . where not prohibited.
>
> For Companies not signatory to the Local 560 – AGC contract, and other Local 560 contracts that do not have a no-strike provision prohibiting area standard picketing, Local 560 intends to aggressively engage in area standards picketing.
>
> . . .
>
> Local 560 will no longer provide advanced notice of picketing.

---

[6] The Winter 2013 Update Letter is addressed to the "AGC, BCA, UTCA and Independent Construction Contractors and Subcontractors." (Ex. 7 to NLRB Br. at 1 [Docket No. 1-3]).

6

(Ex. 7 to NLRB Br. at 1-2 [Docket No. 1-3]). The Winter 2013 Update Letter goes on to state that all "threats to picket" are made, and that actual picketing will be conducted, in accordance with the *Moore Dry Dock* standards for picketing at a secondary site. *Id.* at 2. In addition, the Winter 2013 Update Letter continues: "Local 560 does not seek to enmesh your company in its dispute with County . . . . Whichever redi-mix company you decide to utilize, we recommend prudence be taken to determine which rates of pay and benefits the Company pays its drivers." *Id.*

On February 28, 2013, County filed a sixth charge with the NLRB, No. 22-CC-99341, alleging that the Winter 2013 Update Letter violates Sections 8(b)(4)(ii)(A) and (B).

### E. The NLRB Files This Petition

On April 16, 2013, the NLRB filed this Petition seeking Section 10(l) injunctive relief pending the Board's resolution of the fourth, fifth and sixth charges, relating to the Teachers Village project and the Winter 2013 Update Letter. On May 6, 2013, County filed a brief in support of NLRB's petition. On May 22, 2013, Local 560 filed an answer to the petition and a brief in opposition. The Court heard oral argument on May 28, 2013.

## II. LEGAL STANDARD

Section 10(l) of the NLRA mandates that the NLRB officer or regional attorney seek federal injunctive relief to maintain the status quo during the pendency of administrative proceedings when the prosecuting officer "has reasonable cause to believe such charge is true and that a complaint should issue." 29 U.S.C. § 160(l). "Congress perceived the need for interim relief during the administrative hearing process in order to prevent substantial injury to employers before the Board could obtain judicial enforcement of its decisions following final adjudication." *Miller v. United Food & Commercial Workers Union, Local 498*, 708 F.2d 467, 470 (9th Cir. 1983) (citing S. Rep. No. 105, 80th Cong., 1st Sess. 27, *reprinted in* 1 NLRB, Legislative History of the Labor-Management Relations Act, 1947, at 433 (1948)). Once the NLRB moves for a preliminary injunction, "the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law . . . ." 29 U.S.C. § 160(l).

The standard laid out in this statutory provision is twofold. An injunction will issue (1) if there is reasonable cause to believe the conduct at issue has

occurred and (2) granting injunctive relief would be just and proper. *See Hoeber v. Local 30*, 939 F.2d 118, 123 (3d Cir. 1991). It is a different standard from that under Federal Rule of Civil Procedure 65. *Miller*, 708 F.2d at 470.

To show that reasonable cause exists, the NLRB need not conclusively establish the validity of the propositions of law underlying its charges. Rather, the NLRB's legal theory must be substantial and not frivolous. *Hoeber*, 939 F.2d at 124-25 ("The first factor is whether the NLRB has established a substantial and nonfrivolous legal theory on the basis of which Local 30's § 301 enforcement lawsuit could possibly constitute an unfair labor practice."). Second, "the facts of the instant case" must "fit[] the NLRB's legal theory." *Id.* at 124.

An injunction is generally just and proper where such relief is necessary to prevent frustration of the remedial purposes of the Act." *Moore-Duncan v. Sheet Metal Workers' Int'l Ass'n, Local 27*, 624 F. Supp. 2d 367, 376 (D.N.J. 2008) (citing *Hoeber*, 939 F.2d at 121). "[T]he Congressional purpose behind the enactment of § 10(*l*) was . . . to enjoin clear obstacles and impediments to business, such as strikes, pickets, and boycotts," *Hoeber*, 939 F.2d at 126, and "to preserve the status quo pending adjudication by the NLRB in order to protect the efficacy of the Board's final order." *Moore-Duncan*, 624 F. Supp. 2d at 376. *See also Hoeber*, 939 F.2d at 122 ( "[T]he policy behind permitting 10(*l*) injunctions is to prevent obstacles to the free flow of business pending resolution by the Board of the underlying unfair labor practice claim. In particular, the 10(*l*) injunction was designed to permit courts to suspend strikes, pickets, boycotts, and other direct interferences with business.")

## III. ANALYSIS

### A. Section 8(e)

The NLRB argues in its brief that the PLA violates Section 8(e)'s prohibition against agreements that lead an employer to cease doing business with another employer because the PLA essentially requires all subcontractors, including those delivering ready-mix concrete, to pay area standard wages.[7] Local 560 does not appear to object to this proposition in principle. In fact, Local 560 and the NLRB entered into the August 1 Settlement Agreement to settle the allegations in Charge Nos. 22-CE-84893 and 22-CC-83895 relating to

---

[7] Within the meaning of Section 8(e), Local 560 is a labor organization, Macedos, and Phelps are employers, and County is "any other person."

that very section of the PLA. The settlement required Local 560 to publicly retract the ready-mix subcontracting language that had been conveyed to the contractors on the Teachers Village project, which Local 560 did.

I find that there is reasonable cause to believe that this clause of the PLA violates Section 8(e) because (1) it is secondary in nature and (2) does not fall within the construction industry exception in that section. In short, the NLRB's legal theory is substantial, and the facts fit it.

A clause with a secondary effect is one that is intended to affect the practices of employers who are not parties to the contract. *NLRB v. Int'l Longshoremen's Ass'n*, 447 U.S. 490, 504 (1980) ("The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-à-vis* his own employees." (quoting *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 644-45 (1967))). This is particularly true where the employer that is a party to the contract does not directly employ the particular class of workers at issue. *See, e.g., Colorado Bldg. & Constr. Trades*, 239 NLRB 253, 255 (1978). The NLRB's theory – that these types of clauses are not permitted by Section 8(e) – is substantial and nonfrivolous; indeed, it appears to be correct.

Here, the PLA required Phelps to refrain from doing business with any subcontractor who refused to sign the PLA. Phelps does not even employ a contractual unit of ready-mix concrete drivers, so it would have to hire an outside concrete delivery company. These two facts, taken together, necessarily imply that the PLA provision was secondary in nature. Section 8(e)'s worksite construction exception does not save the provision; under NLRB's rules, it does not encompass the mixing and pouring of ready-mix concrete at a construction site. *See, e.g., Int'l Bhd. of Teamsters, Local 251* (*Material Sand & Stone*), 356 NLRB No. 135 (Apr. 19, 2011) (it is "a hard and fast [Board] rule that the delivery of ready-mix concrete and asphalt falls outside the construction industry proviso."). In this respect, I find reasonable cause to believe that the PLA violates Section 8(e).[8]

---

[8] Local 560 argues that the August 1 Settlement Agreement it reached with the NLRB essentially moots this issue. At oral argument, however, the NLRB contended that the Winter 2013 Update Letter was a subtle attempt to reclaim what the Local 560 had supposedly given up in the August 1 Settlement Agreement:

> Local 560 wishes to remind all AGC Contractors who are signatory to Local 560 construction contracts that **the contract does place certain expectations upon the contractor in regard to area standards**. During

9

## B. Section 8(b)(4)(ii)(A)

The NLRB argues that Local 560 sent two letters that violate Section 8(b)(4)(ii)(A), which prohibits threatening or coercing an employer to enter into an agreement unlawful under Section 8(e), such as the PLA. 29 U.S.C. 158(b)(4)(ii)(A).[9] First, it points to an April 17, 2012 letter from Local 560 to County, copying Phelps and Macedos (the "April 17, 2012 Letter"), which stated:

> [Macedos] has violated the PLA by failing to have County Concrete sign the Letter of Assent. With [sic] such violation to exist, both Phelps and Macedos would be liable for damages under the PLA.
>
> Article 3 Section 2 and 2A2 specifically recognizes and requires that ready mix concrete is under the jurisdiction of this public sector PLA. Should any contractor or subcontractor not perform the ready mix concrete work under the Local 560 PLA Schedule A, a violation exists, with contract damage liability attaching to the violative contractor or subcontractor.

(Ex. C to County Br. [Docket No. 5-3]). Second, the NLRB points to the following language in the Winter 2013 Update Letter:

> the term of the Local 560 collective bargaining agreement, Local 560's enforcement of the provision will be enforced through the grievance and arbitration procedure, though this does not necessarily mean that Local 560 will not be engaging in area standards picketing in the presence of County Concrete . . . where not prohibited.

(Ex. 7 to NLRB Br. at 1-2 [Docket No. 1-3]) (emphasis added). This, believes the NLRB, is intended to warn contractors that they cannot hire any subcontractors that do not pay wages and benefits commensurate with Local 560 standards. I agree that a contractor could reasonably interpret this language as referring to that obligation, which Local 560 had supposedly disclaimed as part of the August 1 Settlement Agreement provision.

At any rate, the August 1 Settlement Agreement does not forever place its subject matter out of bounds, irrespective of a party's later conduct. The Agreement itself allows a court to use evidence of its underlying charges "for any relevant purpose in the litigation of . . . any other case(s), and a judge . . . may make findings of fact and/or conclusions of law with respect to said evidence." (August 1 Settlement Agreement at 1, Ex. 3 to Montalbano Cert. [Docket No. 9-2]).

[9] Within the meaning of Section 8(b)(4)(ii)(A), Local 560 is a labor organization. Phelps, Macedos, and the other contractors who received the Winter 2013 Update Letter are employers engaged in commerce or an industry affecting commerce.

10

> Local 560 wishes to remind all AGC Contractors who are signatory to Local 560 construction contracts that the contract does place certain expectations upon the contractor in regard to area standards. During the term of the Local 560 collective bargaining agreement, **Local 560's enforcement of the provision will be enforced through the grievance and arbitration procedure** . . . .

(Ex. 7 to NLRB Br. at 1-2 [Docket No. 1-3]) (emphasis added).

I find that the language in each letter amounts to a threat sufficient to satisfy the reasonable cause standard.[10] That is especially true in light of the history of the Local 560-County bargaining dispute outlined in Section I.B, *supra.*

In the April 17, 2012 Letter, Local 560 states that Macedos and Phelps would be liable for breach of contract if they hired County without signing the PLA. In the 2013 Winter Update Letter, Local 560 threatens to file an arbitration action or grievance against contractors who hire County. NLRB could reasonably conclude that Local 560 made these statements to coerce Macedos, Phelps, and contractors generally to abide by the PLA – in particular, the aspects of the PLA that are unlawful under Section 8(e). (*See* Section III.A, above.) Accordingly, I find that reasonable cause exists to believe that Local 560 has violated Section 8(b)(4)(ii)(A).

### C. Section 8(b)(4)(ii)(B)

Section 8(b)(4)(ii)(B) prohibits a union from threatening or coercing an employer to prevent it from doing business with any other person. This is commonly known as a secondary boycott.[11] The NLRB argues that Local 560 has violated this provision in three ways: Its president orally threatened Phelps that Local 560 would file a grievance if (1) County remained on the Teachers

---

[10] It is not clear whether the April 17, 2012 Letter was incorporated into the August 1 Settlement Agreement. In any case, I would find that the Winter 2013 Update Letter, standing alone, violates Section 8(b)(4)(ii)(A). And even assuming that the April 17, 2012 Letter was part of the settlement, it would remain relevant. The August 1 Settlement Agreement allows the April 17, 2012 Letter to serve as evidence in other cases. Here, the April 17, 2012 Letter could be used to shed light on the meaning and intent of the language in the Winter 2013 Update Letter.

[11] Within the meaning of Section 8(b)(4)(ii)(B), Local 560 is a labor organization. Phelps, Macedos, and the other contractors who received the Winter 2013 Update Letter are employers engaged in commerce or an industry affecting commerce.

Village project without complying with the PLA or (2) Phelps used any other contractor or subcontractor that did not pay area standard wages and benefits. In addition, (3) the Winter 2013 Update Letter threatened strikes or picketing on any jobsites where County was employed.

Local 560 asserts that the first two alleged violations were subsumed in the August 1 Settlement Agreement. The Winter 2013 Update Letter, it says, is a lawful description of its dispute with County; and to publicize that dispute, Local 560 might engage in lawful area standards picketing.

I find, especially in light of the history of this dispute, that reasonable cause exists to find that the Winter 2013 Update Letter violates Section 8(b)(4)(ii)(B). Because the oral statements made by Local 560's president pre-date the August 1 Settlement Agreement and relate to the underlying charges, and because they are unnecessary to my decision, I decline to determine whether they violate the NLRA.

The Third Circuit has summarized the purpose of the secondary boycott provision:

> Section 8(b)(4)(ii) of the NLRA . . . essentially prohibits union conduct designed to force a primary employer (the employer with which the union has a dispute) to bargain with a union or to force a neutral employer (an employer with which the union has no dispute) to cease doing business with the primary employer. The proscribed methods used to achieve the objectives include threatening, coercing, or restraining the secondary employer. *See, e.g., Soft Drink Workers Union Local 812 v. NLRB*, 212 App. D.C. 10, 657 F.2d 1252 (D.C. Cir. 1980). Coercion can include economic pressure upon the neutral party. *Allentown Racquetball & Health Club, Inc. v. Building and Constr. Trades Council of Lehigh and Northampton Counties*, 525 F. Supp. 156 (E.D. Pa. 1981). The purpose of the prohibition against secondary boycotts is to shield unoffending employers from pressures in disputes not their own, though preserving the rights of unions to bring pressure to bear on offending employers in primary labor disputes. *Anderson v. International Bhd. of Elec. Workers, Local No. 712, AFL-CIO*, 422 F.Supp. 1379 (W.D. Pa.1976).

*Limbach Co. v. Sheet Metal Workers Int'l Ass'n*, 949 F.2d 1241, 1249-50 (3d Cir. 1991).

It is clear that the Winter 2013 Update Letter is a secondary activity. It is not aimed at County, with whom Local 560 has the dispute. Rather, Local 560 sent it to other contractors.

The Letter also evinces an intent to cause the recipient to cease doing business with the primary employer. In three passages, it states or implies that a neutral employer who employs County will face unpleasant consequences. First, Local 560 warns that a "strike and picketing should be expected" because "Local 560 will not stand actionless as County Concrete continues to operate at substandard wages and economic benefits, with affect [sic] to destroy area standard wages and benefits." (Ex. 7 to NLRB Br. at 1 [Docket No. 1-3]). Second, Local 560 warns contractors that it will enforce the PLA's area standards clause against them through the grievance and arbitration procedure. *Id.* Third, the Letter warns contractors that

> If you are going to utilize . . . County Concrete . . ., be well aware that Local 560 will be showing up at your project with picketing and will no longer provide you with advance notice. . . . Local 560's energies and vigorous activities will be persistent and will continue until County Concrete Corp. . . . commence[s] to pay their redi-mix drivers Area Standards when making deliveries in Local 560 geographic territory.

*Id.* at 1-2.

The import of these statements is clear: If County is on the job, the contractor should expect grievances, picketing, and strikes. Indeed, the emphasis on County's refusal to pay area standard wages exemplifies the illegal secondary object of the Letter, because the recipients – contractors and subcontractors – have no direct control over how County pays its workers. The only way a recipient could influence the compensation of County's employees would be to exert economic pressure by refusing to hire County – and that is exactly what the Letter encourages contractors to do. That is the very objective that Section 8(b)(4)(ii)(B) prohibits. *See N.L.R.B. v. Denver Bldg. & Const. Trades Council*, 341 U.S. 675, 688-89 (1951) ("The nonunion employees were employees of [the subcontractor]. The only way that respondents could attain their purpose was to force [the subcontractor] itself off the job. This, in turn, could be done only through [the general contractor's] termination of [the subcontractor's] subcontract. The result is that the Council's strike, in order to attain its ultimate purpose, must have included among its objects that of forcing [the general contractor] to terminate that subcontract." "We accept th[e]

13

crucial finding [of the Board]" that 'an object, if not the only object, of what transpired with respect to * * * [the general contractor] was to force or require them to cease doing business with [the subcontractor] . . . .'"); *see also Gen. Serv. Employees Union Local 73 (Allied Security)*, 239 NLRB 295, 306 (1978) (finding that, in regards to possible picketing, union agent's mention that there were about 80 security firms that met area standards in the phone book was evidence of a secondary boycott); *Local 79, Laborers Int'l Union of N. Am. (JMH Development)*, 354 NLRB No. 14, at *1 (Apr. 30, 2009) (finding cease-doing-business object where "on at least two occasions, union agents told [the neutral employer] that the Respondent would picket 'unless' demolition work at the jobsite was performed by a union contractor instead of [the primary employer].").

Local 560 urges that the Winter 2013 Update Letter's provision that all picketing will comply with the standards of *Moore Dry Dock* turns any otherwise unlawful statement into a lawful one.[12] Such a disclaimer, however sincere, will not erase an unlawful secondary object that is established by independent evidence. As the NLRB has stated,

> Picketing for a lawful objective, such as to preserve area standards, may be unlawful if there is additionally an unlawful objective as revealed by contemporaneous statements of union agents or other pertinent evidence. . . .
>
> We adhere to the rule of *L. G. Electric* that picketing, even though it may be in compliance with *Moore Dry Dock* standards, may be found unlawful where there is evidence that an objective of the union's picketing was to enmesh a neutral in a dispute between the union and another party by disrupting relations between the neutral and such other party. We conclude from an examination of the entire course of conduct engaged in by the Respondent that it would not have been satisfied with anything less than the removal

---

[12] The reference is to the "common situs" picketing standards of *Sailors' Union of the Pacific (Moore Dry Dock)*, 92 N.L.R.B. 547, 549 (1950). There, the Board established a four-part test for determining whether, at a site where both primary and secondary employers are performing work, union picketing constitutes an unlawful secondary boycott. Picketing is lawful if: (1) the picketing is limited to times when the situs of the dispute is located on the secondary employer's premises; (2) at the time of the picketing the primary employer is engaged in its normal business at the situs; (3) the picketing is limited to places reasonably close to the location of the situs; and (4) the picketing discloses clearly that the dispute is with the primary employer. 92 N.L.R.B. at 549.

14

of Rollins from the jobsite, and that this unlawful object, as well as the lawful object of maintaining area standards, was reflected in the picketing.

*Local No. 441, Elec. Workers (Rollins Commc'ns)*, 208 NLRB 943, 944 (1974). *See generally Denver Bldg. & Constr. Trades Council*, 341 U.S. at 689 ("It is not necessary to find that the sole object of the strike was that of forcing the contractor to terminate the subcontractor's contract." (footnote omitted)); *JHM Development*, 354 NLRB at *1 ("In view of the direct evidence of the Respondent's prohibited secondary objective, we find that a violation has been established independently of the unqualified nature of the Respondent's threats to picket."). The *Moore Dry Dock* standards are directed to the manner of the picketing itself; a promise to comply with them does not nullify other violations.

In short, I find that there is reasonable cause to believe that the Winter 2013 Update Letter violates Section 8(b)(4)(ii)(B).

### D. The Just and Proper Standard

Based on reasonable cause to believe there is a violation of the NLRA, a court may issue an injunction if such relief is "just and proper." 29 U.S.C. 160(l). An injunction is just and proper where it suspends pickets and other direct interferences with the free flow of business, for the purpose of preserving the status quo while NLRB makes its final determination. *See Hoeber*, 939 F.2d at 122.

I find that issuing an injunction against Local 560 would be a just and proper means of serving that purpose. I note parenthetically that the contentious history between County and Local 560 has involved six NLRB charges, the apparent breakdown of two informal settlement agreements between the NLRB and Local 560, and this Section 10(l) action. The trend indicates that, absent an injunction, the parties will again find themselves before the NLRB or a court.

The Court finds that the free flow of commerce will best be served by requiring Local 560 to (1) publicly retract the portions of the Winter 2013 Update Letter that violate the NLRA and (2) reiterate that the portion of the PLA already found unlawful is null and void. Such an injunction will prevent Local 560 from engaging in any kind of secondary boycott of neutral employers and from issuing threats to contractors and subcontractors to dissuade them from

doing business with County. At the same time, such an injunction will permit Local 560 to continue to pursue its dispute with County by all lawful means,

## IV. CONCLUSION

For the reasons stated above, the NLRB's Petition for an injunction pursuant to Section 10(l) of the NLRA is **GRANTED**.

The parties are directed to agree on a form of order, or failing that to submit proposed forms of order, within five days of entry of this opinion. Forms of order should be emailed to chambers in MS Word, Word Perfect or other editable format. The email address may be obtained by phone from my courtroom deputy.

_____
KEVIN MCNULTY, U.S.D.J.

Date: June 26, 2013